**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JESSICA CAPLIN,

     *Plaintiff*,

Civil Action No. 20cv21886

**JURY DEMANDED**

v.

EVERGLADES COLLEGE INC. D/B/A
KEISER UNIVERSITY COLLEGE
OF CHIROPRACTIC MEDICINE,

     *Defendant*.

_____/

**COMPLAINT**

## I.    PRELIMINARY STATEMENT

1.    This is an action by JESSICA CAPLIN ("Ms. Caplin"), a student with a documented history of dyslexia and learning disabilities, to which she has a history of receiving accommodations using speech driven auxiliary aids in her past studies. Ms. Caplin seeks protection against and damages for discrimination and retaliatory action taken by EVERGLADES COLLEGE, INC. D/B/A KEISER UNIVERSITY COLLEGE OF CHIROPRACTIC MEDICINE ("Keiser") in response to her repeated complaints to Keiser and her federally protected complaints to the United States Department of Education's Office of Civil Rights (OCR).

2.    Keiser's actions, set forth more fully herein, violate section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act (ADA, ADA-AA), 42 U.S.C. §12131.

3.    For relief, Plaintiff seeks injunctive remedy of non-retaliation, compensatory damages for the significant emotional and financial harm caused by Keiser and for Keiser's

1

retaliation for Plaintiff's exercise of federally guaranteed rights, authorization to take Part 4 of the Chiropractic Boards, along with attorney's fees and costs.

## II.    PARTIES

4.      The Plaintiff is Jessica Caplin, a student dismissed from Keiser's chiropractic school.

5.      Plaintiff is a resident of Palm Beach County and citizen of the United States.

6.      Defendant, Keiser, is a private university located at 2085 Vista Pkwy, West Palm Beach, FL 33411. Keiser is a not-for-profit 501(c)(3) corporation incorporated in the State of Florida and is managed and controlled by Everglades College, Inc. Board of Trustees.

7.      Keiser is responsible for avoiding discrimination on the basis of disability, for complying with Florida law, and for resisting retaliation against persons who make good faith complaints of discrimination/retaliation/failure to accommodate.

8.      Keiser is bound by the Americans with Disabilities Act and its amendments, as well as Section 504 of the Rehabilitation Act.

## III.    JURISDICTION AND VENUE

9.      This action arises under the laws of the United States, and therefore this Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

10.      This action also arises under the following federal statutes: The Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101 et seq., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, at Title II of the ADA, prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. § 12132 (Supp. 1991), the Rehabilitation Act of 1973, §§ 504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including

the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA. Both the ADA and §504 prohibit retaliation against persons with disabilities, or persons who advocate on behalf of a student's education or who have filed a complaint with the Office of Civil Rights (OCR).

11.    Venue is properly in this Court pursuant to 28 U.S.C. §1391, in that all parties reside in this Judicial District and the matters at issue in this Judicial District.

## IV.    LEGAL BASES FOR THIS LAWSUIT

12.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, bars all federally funded entities (government or otherwise) from discriminating on the basis of disability. Section 504 states, in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

13.    Defendant Keiser receives federal financial assistance and is covered by Section 504.

14.    Title II of the ADA prohibits discrimination against individuals with disabilities from educational institutions providing services to the general public and receiving federal financial assistance. The purpose of the law is to ensure that people with disabilities have the same rights and opportunities as everyone else.

15.    Both Section 504 and the ADA prohibit retaliation against any person who has advocated on behalf of their education or participated in a proceeding concerning their education.

## V.    PROCEDURAL AND FACTUAL HISTORY

16.     Ms. Caplin has a documented history of dyslexia and learning disabilities, to which she has a history of receiving accommodations using speech driven auxiliary aids in her past studies. Ms. Caplin has used Dragon Software and Natural Reader in the past as assistive technology to help her in her studies.

17.     Ms. Caplin was recruited by Keiser for its chiropractic program in April of 2016. At that time, Keiser was aware of Ms. Caplin's disability and accepted her into the program promising to accommodate her.

18.     Ms. Caplin requested accommodations from Keiser and was granted based off of her disability 504 Plan and IEP, the following accommodations:

     a.   Extended time for tests/exams/quizzes (2x)

     b.   Private/quiet (separate) room for testing

     c.   Reader for tests/exams (to be coordinated with instructor/dean . . . .)

     d.   Use of relative assistive technology (Kurzweil, Dragon, Natural Reader)

     e.   Alternative book format (if and when available, to be coordinated with dean)

*See Exhibit "A" August 18, 2016 Keiser Letter.*

19.     As part of her studies to become a chiropractor, Ms. Caplin must complete a clinical course in which she and all other clinic students would treat real patients and be evaluated by one of Keiser's professors. Being aware of this requirement, Ms. Caplin, in February 2018, requested her reasonable approved accommodations be ordered so that they would arrive before the time she had to take her clinical course. At that time, she was rejected and told it was too early to be thinking about the accommodations and that the issue would be addressed at a later time when the clinic course got closer.

20.     Ms. Caplin was also provided with reading material for her courses. These reading materials were required to meet her accommodations. Yet, the reading material for the clinic was never compatible with her software nor provided in an accessible format for Ms. Caplin to read with her disability during her time at Keiser.

21.     From the first time Ms. Caplin requested accommodations, countless requests have occurred, and countless discriminatory acts have taken place against her.

22.     Dr. Wiles, Dr. Kruse, Dr. Adorno, Dr. Sikora, Dr. Stabile, Dr. White, Dr. Benavides, Dr. Spilker, President Lea, and any other Keiser employees mentioned herein, are all agents, either as professors, deans or otherwise, at Keiser.

23.     On February 2018, Ms. Caplin informed Dr. Wiles about getting an electronic Health Record ("EHR") with needed assistive technology as part of her mandated accommodations granted by Keiser in an attempt to have everything set up for her clinical class. Dr. Wiles instead responded the issue would be revisited once the clinic approached. This request was made as the clinic was required to order its own set of compatible assistive technology as Ms. Caplin would not be able to use her personal computer due to HIPAA compliance.

24.     On March 15, 2018, Ms. Caplin returned to classes after missing three days due to an unrelated automobile accident where she fractured her finger. Ms. Caplin provided a doctor's note stating she could not participate in manipulation class due to her broken finger. Dr. Sikora advised Ms. Caplin, under Dr. Kruse's direction, that she had to participate in her manipulations class with her broken finger, or she would fail her coursework. Dr. Sikora and Dr. Kruse ignored the doctor's note provided and Ms. Caplin's injury and threatened Ms. Caplin with failing the class. The manipulation resulted in delayed healing of Ms. Caplin's injury. Ms. Caplin reported

the incident to Dr. Wiles, which only caused more friction between Ms. Caplin, Dr. Kruse, and Dr. Sikora.

25.     In October 2018, Dr. Adorno informed Dr. Wiles of the necessity of assistive software for Ms. Caplin's success at Keiser and it was part of Ms. Caplin's mandated accommodations.

26.     On January 31, 2019, Ms. Caplin reminded Dr. Kruse and President Lea about her need for the Dragon Software and natural reader since she would have issues with handwriting notes. Dr. Kruse stated he did not have knowledge of this and would look into the technology Ms. Caplin needed. At this point, Keiser had plenty of time to have ordered the required software to meet Ms. Caplin's approved accommodations yet the reading and writing software, including the forms, were not accessible.

27.     On February 1, 2019, Ms. Caplin spoke to both Dr. Kruse and Dr. Luce and was told the Dragon Software was not available and Ms. Caplin would not be able to participate in the clinic until the software was received.

28.     On February 8, 2019, Ms. Klamson informed Ms. Caplin that a tablet was set aside for use. However, the tablet did not have assistive technology nor any compatible forms to use on the tablet for the clinical course. Ms. Caplin performed her own research on which Dragon Software to order for the clinical purposes and emailed Ms. Klamson with two appropriate options even though both the Disabilities Coordinator and IT Manager should have known the options.

29.     On February 18, 2019, Ms. Caplin was still not allowed to see patients and benched from participation. Ms. Caplin begged Dr. Kruse to allow her to see a patient as she was falling behind all the other students in experience by not being allowed to treat real patients. Ms. Caplin asked another student at Keiser to come to the clinic and request to see Ms. Caplin specifically.

Dr. Kruse allowed Ms. Caplin to see the student without the use of assistive technology and only allowing another classmate to scribe for her as a temporary measure. The scribe was in control of the paperwork and it was challenging for Ms. Caplin to stay organized. The scribe was not trained or approved to provide Ms. Caplin her required accommodations.

30.     In late February 2019, the Dragon Software finally arrived but was unusable due to Keiser's failure to upload the medical forms to the tablet. This problem went on for months, forcing Ms. Caplin to fall behind on her education and without recourse to fix the problem. Neither the Disabilities Coordinator nor the IT Manager were able to intervene and resolve this issue. Every other student at Keiser had equal opportunity to participate in the clinic and had access to the medical forms, except Ms. Caplin, due to her disability.

31.     On March 1, 2019, Ms. Caplin saw another patient at the clinic without any of the accommodations she was promised by Keiser. Five days after the evaluation, Dr. Kruse advised Ms. Caplin that it was a formal evaluation. Dr. Kruse and Dr. Spilker informed Ms. Caplin that she failed the assessment, without taking into considerations that she did not have the required accommodations and the fact that Ms. Caplin was denied three-weeks of training every other student had due to Keiser's failure to provide accommodations for her clinical studies.

32.     On March 8, 2019, Ms. Caplin requested an appointment with Dr. Benavides, her academic advisor, to improve her skills and Dr. Benavides cleared her to see patients under supervision.

33.     On March 11, 2019, Ms. Caplin was informed she was going to see a patient. Prior to the scheduled patient's appointment, Ms. Caplin was shadowing another student during their clinical encounter. Dr. Kruse pulled her out from the learning opportunity to prepare for her

scheduled patient. However, the patient was a no-show and Ms. Caplin was reprimanded for "not doing anything productive" since her patient was a no-show.

34.     On March 13, 2019, Ms. Caplin was informed she was going to see a patient. However, again the patient was a no-show. It became a pattern for Keiser to tell Ms. Caplin she would be scheduled to see a patient and the patient would be a "no-show." Ms. Caplin was told she was unfit to practice on this day without basis. After requesting more information why he felt that way, Dr. Kruse stated he "needed a witness" present to speak with Ms. Caplin. Dr. Kruse brought President Lea and Dr. Stabile to his office for an impromptu meeting with Ms. Caplin. In this meeting, President Lea accused Ms. Caplin of having an inappropriate tone and introduced Ms. Caplin to Dr. Stabile, the disabilities coordinator whom Ms. Caplin had never met before in her three years in the program, and was always informed by Keiser that President Lea was her contact for any accommodation's issues. At this meeting, Ms. Caplin asked President Lea to rectify the accommodation issue so she could finally be able to see patients in the clinic. Ms. Caplin's parents also placed a call to President Lea regarding the needed accommodation in an attempt to rectify the situation.

35.     An informal meeting was planned between the President Lea, Dean Barrios, Dr. Kruse, Dr. Spilker, Dr. Benavides, Dr. Stabile, Ms. Caplin, her parents, and her brother for March 19, 2019 to discuss Ms. Caplin's progression in the clinic and the assistive technology. On March 18, 2019, Ms. Caplin's parents requested that they have a phone conversation instead since they had a vacation planned for March 20, 2019. Ms. Caplin's mother was informed telephonically by President Lea that if the meeting did not occur on March 19, 2019, Ms. Caplin would fail the clinic course and was forced to attend the meeting on March 19, 2019. During the meeting, Ms. Caplin was told she "was not going to be passed in the class just because she has a disability" to which

Ms. Caplin advised she has earned every grade she has received in her studies at Keiser and only requests that she be given an equal opportunity to succeed in the course. President Lea told Ms. Caplin on at least two separate occasions that she was not going to be passed because of her disability. Ms. Caplin's brother requested a sample rubric for evaluation and was informed that one was in the process of being created. At this point, a formal rubric was not in place when Ms. Caplin failed her evaluation. At this meeting, Dr. Stabile suggested Ms. Caplin be provided an automatic blood pressure machine in the clinical setting. Ms. Caplin was then told to return to the clinic and practice skills the following Wednesday and that she would have the Objective Structured Clinical Examination ("OSCE") that following Friday.

36.     On March 20, 2019, Ms. Caplin returned to the clinic and practiced taking blood pressure and reflexes with Dr. Benavides. Ms. Caplin stated to Dr. Benavides that the blood pressure cuff was leaking air and was giving her challenges. Dr. Benavides disregarded her statement and failed to address the issue. Ms. Caplin ended up having a faulty blood pressure bladder, making her exam and learning opportunity nearly impossible.

37.     On March 22, 2019, Dr. Spilker and Dr. Benavides informed Ms. Caplin that she had passed her OSCE exam and that she was able to see patients again under the supervision of Dr. Kruse. At this point, Ms. Caplin had met the required standards to see patients independently. Every other student in the class was able to see patients and did not always have assessments for every patient encounter if the required standards were met, except for Ms. Caplin. During an examination of a patient, Ms. Caplin's blood pressure monitor malfunctioned and was leaking air leading to a faulty read. Ms. Caplin had already reported the faulty blood pressure monitor to Dr. Benavides, who had failed to do anything about the issue. Ms. Caplin asked to use a different blood pressure monitor and was refused this opportunity. Mr. Caplin emailed Dr. Wiles requesting the

automatic blood pressure machine as was approved by Dr. Stabile and Dr. Wiles rejected the accommodation request. Keiser failed to provide required accommodations for this evaluation.

38.     On March 27, 2019, Ms. Caplin's tablet was still not working and Ms. Caplin worked with Dean McCall in an attempt to resolve the situation and receive the accommodations approved by Keiser since August of 2016 but could not resolve the accommodation issue.

39.     On March 29, 2019, Ms. Caplin arranged for a guest speaker to give a presentation to the Grand Rounds class. Dr. Kruse informed Ms. Caplin that she was not allowed to be at the presentation because she would potentially be seeing a patient. However, Dr. Kruse never actually assigned Ms. Caplin a patient on March 29, 2019.

40.     On April 1, 2019, Ms. Caplin still did not have her own case despite everyone else in the clinic being assigned several. While observing another clinic student, Ms. Caplin was directed by the other student to get a paper form filled out (not accessible with Ms. Caplin's technology) by his patient in the waiting room pertaining to whether the patient was experiencing neck pain. After the shift, Dr. Kruse reprimanded and advised Ms. Caplin in the clinic hallway to never do that again.

41.     Since passing the OSCE exam on March 22, 2019, Ms. Caplin was still not being provided her accommodations or assigned any patients to examine in the clinic. On April 2, 2019, Ms. Caplin was told she would be assigned a patient the following day. Ms. Caplin asked Dr. Benavides whether her accommodations would be provided and whether she would be evaluated again as she had not had any patient encounters between graded exams. Since passing her OSCE on March 22, 2019 and since beginning the clinic in January, Keiser staff continuously failed to give Ms. Caplin equal opportunity to participate and learn at the clinic.

42.     On April 3, 2019, after Ms. Caplin finished observing the other student and her patient, they were both disciplined by Dr. Kruse because they had a general conversation with the patient. This resulted in Ms. Caplin being late to her next class.

43.     On April 3, 2019, Ms. Caplin was finally assigned to a patient and was handed a tablet without a keyboard or any accessible clinic forms rendering the tablet useless.

44.     Ms. Caplin went to the student lab to practice her clinical skills and was later called to the clinic to see a patient without the use of a scribe or accommodations. Within five minutes of being in the room, Ms. Caplin was pulled out of the room by Dr. White and forced to sign a "HIPAA Violation" document she did not understand. *See Exhibit "B" Inquiry Regarding HIPAA Policy Violations.* Ms. Caplin was required to enter a room and not allowed to leave without signing the document, which was not made accessible with her assistive technology nor was Ms. Caplin allowed any time to review the document.  Ms. Caplin did not commit any HIPAA violation and it was merely Keiser's attempt to place Ms. Caplin on a behavioral probation and disparage her professional reputation. Due to this fiasco, Ms. Caplin missed her patient's entire case history and had to share her case with another student, all the while unknowingly being evaluated for her patient encounter. Ms. Caplin performed the vitals and lumbar exam and was told to leave the room and wash her hands. Upon returning, the other student was redoing all her testing and checking her work at the direction of Dr. Kruse suggesting Ms. Caplin performed them incorrectly. Dr. Kruse failed to show that Ms. Caplin ever performed this incorrectly or attempted to teach her if she had done it incorrectly. Instead, Dr. Kruse pinned another student against Ms. Caplin to undermine her and used that student to redo the work. Ms. Caplin then suggested to Dr. Kruse that she perform ESTIM for 12 minutes on the patient and cox flexion distraction as well as manipulation. The other student was instead assigned Ms. Caplin's suggestion of lumbar

11

manipulation, taking away Ms. Caplin's equal opportunity to treat the patient. Dr. Kruse failed Ms. Caplin in her evaluation for this exam.

45.     On April 5, 2019, Ms. Caplin set up an appointment with Dean McCall to resolve her accommodation issues. Dean McCall and Ms. Caplin agreed that Ms. Caplin should do a test run before using the tablet in the clinic. At this time, Ms. Caplin brought to Dean McCall's attention that she was still missing all of her Outcome Assessment Tools ("OATS") forms and needed them to be uploaded as these forms were essential in the clinic. By this time, Keiser had been on notice for months regarding Ms. Caplin's accommodations and continuously failed to provide them for her.

46.     Dr. Kruse called Ms. Caplin into his office to speak about her evaluation and both him and Dr. Sikora advised Ms. Caplin that she was still insufficient in the areas of difficulty that she had been cleared for two weeks prior. Dr. Benavides and Dr. Spilker agreed during her OSCE that Ms. Caplin needed practice with patients that every other student was receiving, but they were not concerned with Ms. Caplin to hold her back from practicing as an intern in the clinic. Dr. Kruse required that Ms. Caplin sign a remediation form without an advocate present or the information being accessible with her assistive technology. Ms. Caplin requested a copy of the form and time to review it.

47.     On April 9, 2019, Ms. Caplin was given a flash drive that contained personal patient information to complete under Dr. Kruse's instruction as a clinic take-home assignment in radiology. Ms. Caplin reported the HIPAA violation to Dean Wiles, as was required under the situation. Ms. Caplin did not want to get in trouble since she was already forced to sign a previous HIPAA Violation form for a false violation. Instead of praise, Ms. Caplin was received with slander and statements blaming her for making an alleged false HIPAA complaint to the Dean

without him reviewing any of the evidence. Dean Wiles revealed to Ms. Caplin's professors that she reported the violation anonymously to him, violating the Family Educational Rights and Privacy Act ("FERPA"). This left Ms. Caplin in a compromising position with her professors.

48.     On April 10, 2019, Ms. Caplin saw a patient and was evaluated by Dr. White. Dr. White gave her a passing score and told Ms. Caplin that she scored highest in the professionalism section. Ms. Caplin requested a copy of her evaluation sheet to review but was told by Dr. Kruse "that a witness must be present for every interaction between them." No other student required a witness for every encounter with Dr. Kruse, only Ms. Caplin.

49.     On April 12, 2019, Ms. Caplin again did not have a patient assigned to her. On April 13, 2019, the tablet was still not provided with working accommodations.

50.     On April 15, 2019, Dr. Kruse insisted that Ms. Caplin sign the evaluation from April 3, 2019. Ms. Caplin stated she did not feel the evaluation was performed fairly as she did not have the required accommodations and was pulled out from the evaluation to discuss the alleged HIPAA incident.

51.     Ms. Caplin then received another evaluation from Dr. Sikora and Dr. Stabile but only received a 1.5 rating. During this evaluation, Ms. Caplin demonstrated proper technique for reflexes and used the automatic blood pressure machine without a problem. The poor evaluation test was a result of bias and was subjective in nature. Ms. Caplin demonstrated proper technique throughout the care of the patient and Ms. Caplin had performed this type of examination on many occasions without a problem. After this encounter, Ms. Caplin requested a meeting with Dean Wiles to go over the concerns for signing the chiropractic handbook as it did not state anything regarding students with learning disabilities. As of today, the chiropractic handbook still does not contain any statements regarding students with learning disabilities.

52.     A meeting took place on April 24, 2019 with Dr. Wiles, President Lea, Ms. Caplin and her parents. Ms. Caplin advised the staff that her parents would be present because she felt uncomfortable by the situation. Once they arrived, Dr. Wiles was already with President Lea and told Ms. Caplin's parents that they would only speak to Ms. Caplin and were under no obligation to speak to them. This decision denied Ms. Caplin her right to an advocate. Dr. Wiles and President Lea told Ms. Caplin that she was below minimum standard and that she failed the clinic, which was a total of 6 credits, and would have to repeat it. Ms. Caplin requested an incomplete grade in the class as she was not provided the adequate clinical experience or assistive technology during the course, but Dr. Wiles and President Lea denied the request. Ms. Caplin requested an additional evaluation, which was reluctantly granted. However, it was obvious at the time that the evaluation would fail Ms. Caplin as the staff was intentionally discriminating against Ms. Caplin.

53.     After the meeting, Ms. Caplin went to her clinical class and spoke to Dr. Stabile after the class. Dr. Stabile stated he would speak to Dr. Wiles about allowing an incomplete in the class.

54.     On April 26, 2019, Ms. Caplin had an evaluation and received a grade below the passing threshold to pass the course. The evaluation was verbally reviewed with Ms. Caplin briefly without detail or specifications. Ms. Caplin was then forced into a room by Dr. Wiles, President Lea, and Dr. Benavides. Ms. Caplin, feeling uncomfortable by the situation requested that her parents be present for the meeting as every ADA student had a right to an advocate representation when requested. The request was denied so Ms. Caplin requested that the meeting be terminated and reconvene at another time. This request was also denied, and Ms. Caplin was given a behavioral probation for her actions. *See Exhibit "C" Inquiry Regarding Pattern of Unprofessional Conduct.*

55.     On April 27, 2019, Ms. Caplin realized she received an "F" in her clinical course upon reviewing her Blackboard Account transcripts.

56.     On May 1, 2019, Ms. Caplin received an email from Dr. Wiles with her new schedule, which indicated Ms. Caplin failed her clinic course and was blocked from taking two courses designated for the following semester.

57.     On May 5, 2019, Ms. Caplin emailed her advisor Dr. Benavides stating that her previous semester did not provide her with equal opportunity to be successful and would like her clinic course grade to be changed from "F" to Incomplete as she was not given an equal opportunity in the clinic to demonstrate her abilities with the appropriate accommodations. Ms. Caplin received an email from Dr. Wiles stating that the incomplete request would be considered. Dr. Wiles stated he would like to meet on May 14, 2019 to further discuss the possibility of receiving an incomplete grade in the clinic.

58.     On May 6, 2019, the faculty made Ms. Caplin repeat semester 8 (clinic 4 course) and her FERPA was violated once again, as her personally assigned schedule was posted on the clinic wall for all to see. Ms. Caplin's accommodations were again not met even though this was Ms. Caplin's second time taking the course. Ms. Caplin never received notice from Dr. Kruse of the clinic orientation. Ms. Caplin was later reprimanded for missing the orientation even though she never received notice of it. Ms. Caplin was advised that she would only be allowed to observe patients for the first two weeks of the semester and would not be allowed to be the main intern. However, Ms. Caplin in fact was not allowed to be the main intern on any cases for over three weeks and was not given the same equal opportunity as the other students in the clinic.

59.     On May 8, 2019, Ms. Caplin engaged in email conversations with Dr. Kruse and President Lea and they stated they would work on making the Keiser Clinic Forms compatible

with the tablet, but that in the meantime Ms. Caplin would be provided with a scribe, continuing to put her at a disadvantage. Specifically, President Lea emailed Ms. Caplin stating, "We are going to have you use a scribe for now. This will meet the spirit of the accommodation." A scribe did not meet Ms. Caplin's accommodation requirements and was never added to Ms. Caplin's 504 plan. Providing a scribe was not only a breach of the agreed accommodations but it was not a workable solution to Ms. Caplin's disability. Ms. Caplin requires assistive technology to have notes dictated into the clinic form and read back to her and keep her organized, as well as needing reading software, and Keiser had plenty notice of Ms. Caplin's disability and required accommodations at this point.

60.     On May 14, 2019, Ms. Caplin, Ms. Caplin's mother, Hava Leipzig Holzhauer (paid advocate), Dr. Wiles, President Lea, Dr. Stabile, and John Sites had a meeting to discuss receiving an incomplete in the clinic course and to come to an agreement as to how to proceed. The conversation led to a proposed agreement between all parties that Ms. Caplin would be provided with a fresh start, including full use of working assistive technology, access to at least one patient per clinic day, and the removal of any unnecessary behavioral probations, and weekly team check-ins. The oral agreement was to be drafted between Ms. Caplin's advocate and John Sites, but it never came to fruition. Instead, Keiser's counsel created a unilateral agreement that favored Keiser and undermined the attempted agreement from the meeting. Ms. Caplin never agreed nor signed the draft Keiser's counsel sent. In response to Ms. Caplin's discrimination claims, Keiser stated Ms. Caplin was incapable of succeeding in her clinical coursework despite receiving mostly A's in her prerequisite skills courses and passing of part one of the chiropractic board exam.  In addition, Ms. Caplin's assistive technology was never fully functional, her behavioral probations were never removed, no weekly team check-ins, and Ms. Caplin eventually received an "F" in her

clinic course and an "unnecessary withdrawal" on her transcript for semester 9 clinic 4 course. *See Composite Exhibit "D" Course Completion Memorandum of Understanding*.

61.     On May 27, 2019, Ms. Caplin emailed Dr. Wiles her self-created clinic intake forms as an alternative to the Keiser Clinic Forms, as the forms were still not compatible with the tablet as promised by Keiser. On May 30, 2019, Dr. Stabile stated in a meeting that Ms. Caplin's forms were approved for clinical use. Dr. Stabile and Ms. Caplin discussed that some components were needed to make the tablet fully accessible. Since Keiser continuously failed to provide Ms. Caplin with forms compatible with her assistive technology, Ms. Caplin attempted to create her own version of the clinic form in order to equitably participate in the clinic. Ms. Caplin then asked President Lea to order the necessary components for the tablet to be functional.

62.     On May 31, 2019, Ms. Caplin was assigned her first patient of the semester without prior notice and she was evaluated by Dr. Sikora. At this evaluation, Ms. Caplin's patient was a relative of Dr. Sikora's. In front of Ms. Caplin and Ms. Ramnarine who was scribing (as technology was still not accessible), Dr. Sikora called the patient an "idiot." The patient and Dr. Sikora then engaged in an interaction that made Ms. Caplin and Ms. Ramnarine very uncomfortable and failed to give Ms. Caplin an equal learning opportunity that everyone else had in the clinic.

63.     On June 5, 2019, Ms. Caplin received a formal evaluation by Dr. Priest and was not granted the use of her self-made clinical forms approved by Dr. Stabile. Ms. Caplin was placed at a disadvantage as her accommodations were still not met by Keiser.

64.     On June 6, 2019, Dr. Wiles accused Ms. Caplin that her self-made forms were a "crib sheet" because Ms. Caplin asked to use them during her formal evaluation. Ms. Caplin created the clinic forms as a temporary solution as Keiser failed to provide the accommodations and workable forms in order for her to succeed in the clinic. Keiser instead should have made these

forms compatible with Ms. Caplin's software yet failed to do so and Ms. Caplin created the forms in order to succeed. Ms. Caplin responded to Dr. Wiles by stating that she would be happy to use the proper clinic forms if Keiser provided her the required documentation for her to use her assistive technology which would allow her to read and dictate into the forms. The entire issue was a result of Keiser's lack of providing adequate accommodations and a denial of equal opportunity to Ms. Caplin.

65.     On June 7, 2019, Ms. Caplin had a conversation with Dr. Sikora requesting that she review Ms. Caplin's self-made intake forms and explained why these forms were created in the first place. Dr. Sikora emailed Ms. Caplin that she could use the self-made forms. President Lea also emailed Ms. Caplin stating that Dr. Sikora did not have the authority to approve her self-made forms and that Dr. Wiles had to approve them before they could be used.

66.     On June 7, 2019, Dr. Sikora emailed Ms. Caplin regarding a potential HIPAA violation for Ms. Caplin's request of an email copy of the feedback from an informal assessment that occurred earlier in the day. This continued harassment was made to disparage Ms. Caplin's professional reputation and to retaliate against Ms. Caplin for requested her required accommodations.

67.     On June 8, 2019, Dr. Wiles referred to Ms. Caplin's self-made intake forms as "orthopedic and neurologic crib sheets" and that she "should strive to gain independence from such aids eventually." Dr. Wiles also stated that "The feedback from the assessed visit provided by Dr. Priest was largely focused on skill performance which has nothing to do with assistive technology… As far as a retake is concerned, it is not possible." Dr. Wiles failed to realize that Keiser did not provide the forms according to her accommodations and Ms. Caplin was just trying to remedy the absence of workable clinical forms that Keiser failed to provide.

68.     On June 10, 2019, Ms. Caplin again received a scrutinizing evaluation from Dr. Sikora stating that her skill levels were not up to standards. On the evaluation, Dr. Sikora falsely stated that Ms. Caplin agreed that her technology was fully functional. However, this was far from the truth as the necessary forms were not functional with Ms. Caplin's assistive technology.

69.     On June 12, 2019, Dr. Wiles stated, "The newly created Word forms that I sent earlier today, are, as you have pointed out, the forms that patients fill out – not the doctor's intake forms. I was mistaken when I sent these to you. The actual doctor's intake forms are not yet available in Word." It had been over five months since the clinic opened and still Keiser had failed to make the appropriate accommodations for Ms. Caplin as approved when she first began at Keiser.

70.     On June 14, 2019, Ms. Caplin had another graded evaluation with Dr. Sikora, in which she did not receive feedback from until the following week and Dr. Sikora never offered Ms. Caplin an opportunity to practice and improve on her skills as every other student in the clinic is able to do.

71.     On June 17, 2019, Ms. Caplin previously notified the registrar's office of many discrepancies on her transcript. Ms. Caplin finally received an email from the registrar's office stating that there were issues with her transcripts and stating that "several of your courses were printing out incorrectly on your transcript." The registrar's office claimed they corrected the issue but never did until Keiser received Ms. Caplin's OCR Complaint.

72.     On June 18, 2019, Ms. Caplin received an email from Dr. Kruse with a below average score for the evaluation from June 14, 2019 administered by Dr. Sikora without explanation. Later, Ms. Caplin received an Addendum stating the evaluation was even worse than

Dr. Sikora initially stated. After that evaluation, Ms. Caplin never received feedback reports again for the remainder of the semester.

73.     Ms. Caplin asked Dr. Priest why she was not receiving feedback in a timely manner and he responded that her evaluations needed to be screened by Keiser's General Counsel and Dr. Wiles prior to Ms. Caplin receiving them. At times, this "screening" process would take weeks before Ms. Caplin could receive feedback on her evaluations. There is no record of another student being treated in the same manner Ms. Caplin has. No other student evaluation had to be screened by Keiser's counsel prior to being given to the student, failing to give Ms. Caplin an equal opportunity as the other students in the clinic.

74.     On June 24, 2019, Dr. Kruse again harassed Ms. Caplin in front of Ms. Caplin's boss Dr. LeVine who was visiting campus that day and was having work related small talk with Ms. Caplin during her free time. Ms. Caplin was belittled and forced to leave the room under Dr. Kruse's instructions.

75.     On June 28, 2019, Ms. Caplin again received a biased evaluation where she received a failing score and did not receive feedback or an explanation.

76.     On June 29, 2019, Ms. Caplin received an email from Dr. Wiles stating that she was being pulled from her "clinic 4 course" halfway through the semester and that she was receiving a failing grade in exchange of the incomplete she was given temporarily. No notice was given, and she was completely removed from her clinical education experience (including patient observations and clinical practice). *See Exhibit "E" Email*. Ms. Caplin was never provided her required accommodations and was pushed back an additional semester as retaliation and forced to pay additional tuition and expenses.

77.     On July 24, 2019, Dr. Wiles denied Ms. Caplin's right to take her part 4 chiropractic board exam and that Ms. Caplin was going to be pushed back two semesters. *See Exhibit "F" Email.*

78.     On August 6, 2019, Ms. Caplin ordered and paid extra for her official transcripts and discovered that she was still missing six credits and there were many errors that needed to be corrected. Keiser was on notice that there were problems in Ms. Caplin's transcripts prior to June 17, 2019 and still had failed to fix any of the problems. *See Exhibit "G" Transcripts.*

79.     On September 4, 2019, Ms. Caplin received an email with the new course requirements for the Fall 2019 semester clinic 4 course. At this time, Keiser has failed to make the course and some of the necessary paperwork accessible to Ms. Caplin's assistive technology and there is no promise of providing such accommodations to Ms. Caplin in the foreseeable future.

80.     Ms. Caplin again repeated the clinic 4 course in Fall 2019 due to Keiser's constant discrimination and retaliation.

81.     On September 9 and 11 of 2019, Dr. Sikora stated that new clinic forms were created, and Ms. Caplin was not given an opportunity to review them nor allowed opportunity to see patients as the main intern.

82.     On September 15, 2019, Ms. Caplin emailed Dr. Wiles regarding being able to practice with the new clinic forms on her tablet but was not given the opportunity.

83.     On September 25, 2019, Ms. Caplin again emailed stating she was having issues with her assistive technology in the clinic.

84.     On September 27, 2019, Ms. Caplin saw a Keiser staff member as a patient in the clinic. She had never previously treated this patient, but the staff member was aware of Ms.

Caplin's OCR complaint against Keiser. This patient ultimately refused treatment from Ms. Caplin and was informed to document same in her notes.

85.     On October 1, 2019, President Lea sent Ms. Caplin an email requesting she meet with Dr. Wiles and Dr. Stabile to sign new semester ADA documents. Ms. Caplin had never been asked to do this before this time. On October 2, 2019, Ms. Caplin attended the meeting and was given the ADA paperwork. Ms. Caplin requested to have her attorneys join the meeting telephonically but was refused the request. She was then dismissed without signing the paperwork.

86.     On October 7, 2019, Dr. White interrogated Ms. Caplin demanding answers on the importance of why she needed the Dragon assistive technology. Ms. Caplin was then assigned a patient on this day while Dr. White supervised. During the encounter, Ms. Caplin was pulled out of the room and told that she was to only take the history of the patient but could not treat the patient and Dr. White would continue to supervise. No other clinical students were subjected to this type of discrimination and retaliation.

87.     On October 18, 2019, Ms. Caplin was called to the front of the clinic and was told she would be the lead intern in a new walk-in case. However, moments later, Dr. Kruse reassigned the patient to another clinical student stating the case "too complex" for Ms. Caplin to handle. Being that Keiser prides itself in having a "teaching" clinic, this should have never happened. In fact, Keiser just continued to discriminate against Ms. Caplin for her disability.

88.     On October 28, 2019, Ms. Caplin received her first evaluation of the semester from Dr. White. Dr. White's evaluation was biased and failed to notice things she was required to do in the course at his direction. Dr. White's feedback was not in an accessible format with Ms. Caplin's assistive technology.

89.     On October 30, 2019, Ms. Caplin spent the entire clinical class day sitting in a cubicle as she was not given an opportunity to treat a patient. She briefly observed two patients on a follow up treatment from other student interns but was benched from participation as the clinic failed to provide her with any patients. She was still, at this date, locked out of the chirotouch software, an electronic health record used by Keiser student clinic.

90.     On November 1, 2019, Ms. Caplin again spent most of her clinical class sitting in a cubicle and was not given an opportunity to treat or observe patients. Ms. Caplin reviewed her chirotouch software and found issues with the software not being compatible with the Natural Reader software installed in the tablet and informed Dr. Kruse of these issues.

91.     On November 6, 2019 and November 13, 2019, Ms. Caplin again was not assigned any patients to treat and briefly observed two patient encounters other clinical students had.

92.     On November 20, 2019, Ms. Caplin spoke to Dr. Spilker regarding the incompatibility of chirotouch and natural reader software. Dr. Spilker stated it was not Keiser's problem that the software was not compatible. During this conversation Ms. Caplin requested to meet with Chirotouch representatives that were visiting campus and was refused the opportunity. At that point, Ms. Caplin felt powerless because her rights under the ADA continued to be violated, she continued to be discriminated against, and she was excluded from hands-on training by Chirotouch representatives.

93.     On November 22, 2019, Ms. Caplin received an email that Dr. Benavides was going to be her new advisor. Dr. Benavides had previously discriminated against Ms. Caplin and Ms. Caplin had previously requested for a change of advisor.

94.     After multiple requests from Ms. Caplin pertaining her lack of assistive technology, Dr. Stabile refused to meet with Ms. Caplin and denied that there were any issues with her assistive

technology and chirotouch.  In fact, Dr. Stabile stated, "I have spoken with the campus and they disagree with your assertion that the equipment is malfunctioning or that we have not provided the appropriate assistive technology. As I understand it, you are able to dictate into a Word document, cut the text and paste it into ChiroTouch notes." Dr. Stabile did not understand or attempt to understand the problems with the assistive technology and why it was not working efficiently.

95.    Ms. Caplin called chirotouch with an IT staff at Keiser. The chirotouch software representative stated that chirotouch was not compatible with any reading software and that an initial request would have to be put in for a review to see if changes could be implemented. Keiser was notified long in advance that the electronic health record needed to be compatible with reading and dictation assistive technology in order to accommodate for Ms. Caplin's documented disability and chose to violate federal law anyway.

96.    On November 25, 2019, Ms. Caplin was assigned a Keiser staff member as her patient. On that date Ms. Caplin was not allowed to do a practice run on the chirotouch software that was not compatible with her reading software. At the start of her treatment of the patient, Ms. Caplin was informed she would be evaluated. The dictation device was malfunctioning, and Ms. Caplin could not use it for her encounter. After taking the case history, Ms. Caplin informed Dr. Luce the kinds of testing she would like to perform on the patient. Dr. Luce informed her that she should exclude all neurological testing. Dr. Luce informed Ms. Caplin that she had improvements in her evaluation and would later provide feedback on her performance. However, Ms. Caplin was later informed her evaluation for the exam would be thrown out as she did not perform neurological testing, even after being instructed by Dr. Luce to not perform any neurological testing under any circumstance.

97.     Ms. Caplin's attorneys emailed Keiser pertaining to the fact that Ms. Caplin was rarely allowed to see patients and had only one assessment the entire semester. Ms. Caplin was not placed into any remediation during this semester and it became apparent Ms. Caplin was continued to be discriminated against and Keiser was retaliating against her for the complaints regarding Keiser's discrimination.

98.     On November 27, 2019, after emails to Keiser from the undersigned counsel, Ms. Caplin was assigned a patient (a Keiser staff member) at the instruction of President Lea. Ms. Caplin's assistive technology was still not working during this encounter. Ms. Caplin evaluated the patient and was reprimanded for requesting more clinical information prior to performing chiropractic manipulations for the patient. The patient had an extensive past medical history and injuries which sparked Ms. Caplin's concerns. Professor Spilker unjustly accused Ms. Caplin of wasting her patient's money by suggesting the patient undergo unnecessary tests and additional testing that would cost the patient an additional $2,500.00 for imaging. Ms. Caplin explained that the patient had previous imaging that she would like to look at and his new scans could be taken at a VA center, which would be covered under his health benefits.

99.     Additionally, Dr. Spilker's initial feedback on the encounter was inaccessible with Ms. Caplin's assistive technology and she was not provided accessible feedback to review until one week later.

100.    On December 2, 2019, after countless requests to speak with Dr. Benavides and after three months of requesting to meet with an advisor, Dr. Benavides agreed to meet with her. During their meeting, Ms. Caplin discussed her concerns pertaining to chirotouch's incompatibility with natural reader, her approval to take her part 4 chiropractic board exam, where she stood in the clinic course as she was barely given any opportunities to treat patients and have patient

encounters and feedback she was still awaiting on previous assessments. Dr. Benavides questioned Ms. Caplin as to why she switched from him being her academic advisor the previous semester. The line of harassing questioning made Ms. Caplin feel uncomfortable. Ms. Caplin requested his notes at the end of the meeting and Dr. Benavides refused. This is a violation of Keiser's protocol as all students are required to receive a copy of advisor/advisee meeting notes.

101.    On December 4, 2019, Ms. Caplin had a patient encounter and was given an evaluation by Dr. White. During the encounter, the patient verbally praised Ms. Caplin for her thorough clinical assessment and asked her for her student intern business card. Ms. Caplin requested that the client be provided a survey sheet but the receptionist at the clinic refused to provide Ms. Caplin with a survey sheet. Ms. Caplin did not receive feedback from Dr. White for the encounter until the last day of the semester, more than two weeks later. The feedback was biased and did not provide Ms. Caplin with a score/grade for that encounter.

102.    On December 5, 2019, Dr. Kruse sent an email to all clinical students, including Ms. Caplin, with the upcoming clinical schedule for the following semester. Ms. Caplin was the only intern whose name was not listed. Keiser, from that moment, intended on failing Ms. Caplin again from the clinic 4 class and purposely broadcasted this information to the entire class despite the fact that the semester had not ended yet.

103.    On December 6, 2019, Ms. Caplin was assessing a patient who appeared to have extremely high blood pressure. Under Dr. Benavides' direct supervision, and even though the patient had high blood pressure, Ms. Caplin was told to continue the exam and perform her orthopedic and neurological testing. After the completion of the testing, Dr. Benavides stepped in and took over the case without allowing Ms. Caplin to deliver her report of finding to him, for

which she was later reprimanded. Ms. Caplin did not receive feedback from this evaluation for two weeks and the feedback was biased without a score/grade.

104.    On December 18, 2019, Ms. Caplin was not given a patient to treat and only observed two patients receiving follow up treatment from other clinic students.

105.    On the last day of the semester, December 20, 2019, Ms. Caplin still had not received feedback for two of her assessments in the course and emailed her professors requesting them. She received the feedback on the last day without any grades on them. The feedback was again subjective and biased. She was not given any patients to observe on this day.

106.    Within ten minutes after leaving the clinic, Ms. Caplin checked her blackboard account and saw she had received a failing grade for the clinic 4 class again. It is confusing how Ms. Caplin could receive a failing grade in the class when two of her assessments had still not been graded.

107.    On December 24, 2019, Ms. Caplin received an email from Dr. Wiles denying her the right to take Part 4 National Chiropractic Board Exam.

108.    Ms. Caplin's accommodations were simple. Keiser would not suffer undue burden by meeting Ms. Caplin's accommodation and the accommodations would not change the essential requirements of the clinic course. All documents Keiser uses in the clinic course should be designed to be automatically usable with any type of screen reading or writing technology so as not to discriminate against persons with disabilities and be easily accessible at the beginning of the clinic courses to allow equal learning opportunities to all students. Keiser failed to meet these requirements.

109.    Due to Keiser's failure in providing Ms. Caplin the appropriate accommodations and equal opportunity as every other student, Ms. Caplin missed out on scholarship opportunities

and has had to reject a bonified job offer. *See Exhibit "H" Letter from Back in Balance Healing Collective*. The delay caused Ms. Caplin over a year delay in completion of her coursework, payment of additional tuition, and lost wages. Ms. Caplin can only now be considered for entry level positions as a chiropractic assistant earning an average of $12–$14 per hour, less than what Ms. Caplin was earning prior to enrolling in Keiser's program.

110.     Keiser not only failed Ms. Caplin in her clinic 4 course after failing to provide reasonable accommodations, but also dismissed her from the graduate program in December 2019. *See Exhibit "I" December 27, 2019 Keiser Letter*.

111.     On December 27, 2019, Ms. Caplin received an email from Dr. Wiles removing her from the chiropractic program for failing the clinic twice. This email states:

> Keiser University's policy on repeating courses requires students to successfully complete their graduate level course with a grade of "C" or higher, after the initial attempt. A second successive failure will result in dismissal from the graduate program.
> After careful review of your records, we have determined that you have earned a second failing grade in DCP975 Clinic Practice 4. Therefore, in accordance with Keiser University policy, it is necessary to dismiss you from the Doctor of Chiropractic program.
> As per the Graduate Catalog, students who have been dismissed from a graduate program may not reenter without a personal interview by the Graduate School to determine the suitability of the student for graduate education. The results of such interviews will be submitted to the Office of the Graduate School.

*See Exhibit "J" Email*.

112.     Ms. Caplin filed a Complaint with the United States Department of Education, Office for Civil Rights on September 6, 2019 (the "OCR Report").

113.     The OCR Report investigation is still underway.

114.     Keiser cannot take further retaliatory action against Plaintiff as it did the ultimate retaliatory action, dismissing Ms. Caplin from the program.

115.    Plaintiff now files this suit in this United States District Court to address Defendant's discrimination against Ms. Caplin's disability and Defendant's retaliatory actions against Ms. Caplin.

**COUNT I**
**VIIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, AS AMENDED, 29 U.S.C. § 794**

116.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 115 as if incorporated fully herein.

117.    Ms. Caplin is an individual with handicaps as defined by the Rehabilitation Act, 20 U.S.C. § 794, *et seq*.

118.    Ms. Caplin was at all times relevant hereto "otherwise qualified" to participate in Keiser's educational program.

119.    Keiser has and currently is providing educational services to the general public and receiving federal financial assistance and is, therefore, a covered entity within the meaning of the Rehabilitation Act. Keiser is a recipient of federal assistance within the meaning of 29 U.S.C. §794(a). Keiser's chiropractic program is a "program or activity" within the meaning of 29 U.S.C. § 794(b).

120.    Keiser violated Section 504 in its gross mismanagement of its education program as it pertains to students with disabilities and providing accommodations for Ms. Caplin, all of which subjected Ms. Caplin to discrimination on the basis of her disabilities.

121.    Keiser has continuously failed to provide Ms. Caplin with reasonable accommodations.

122.    By committing the acts described above, without limitation, failing to accommodate Ms. Caplin in its educational program, failing to provide her with all her required

accommodations during the clinic course, by continuously benching Ms. Caplin from participation on account of Keiser's failure to provide accommodations, and by discriminating against her in the provision of educational services on the basis of her disability. Defendant has violated Plaintiff's right under Section 504.

123.    Since Ms. Caplin's enrollment at Keiser, Keiser, by and through its employees, all acting under color of law, have engaged in a pattern of discrimination, harassment, intimidation, and retaliation against Ms. Caplin.

124.    Keiser is excluding and/or discriminating against Ms. Caplin solely on the basis of her disability. As a result, Ms. Caplin has suffered and will continue to suffer extreme hardship and actual and impending irreparable harm.

125.    Such discrimination, harassment, intimidation, and retaliation referred to above would not have occurred but for the Plaintiff's complaints and requests to be provided with her required accommodations, complaints about Keiser's program, her filing of internal complaints with Keiser, and OCR Complaint filed.

126.    Ms. Caplin has no adequate or speedy remedy at law for Keiser's conduct described above. Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief against the Defendant is appropriate pursuant to 42 U.S.C. § 12133.

127.    Plaintiff is also entitled to recover reasonable attorneys' fees and costs incurred in bringing this action.

128.    Defendant's policies, practices, and procedures, particularly the actions and omissions described above, violated the Plaintiff's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

129.     Defendant has acted either intentionally or in deliberate disregard for the protected rights of the Plaintiff herein.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against the Defendant, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies, and procedures have subjected Plaintiff to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining the Defendant from any practice, policy and/or procedure which will deny Ms. Caplin equal access to, and benefit from the Defendant's services, award compensatory damages; reinstate Ms. Caplin into the educational program and allow Ms. Caplin to complete her clinical courses at an outside facility; require Keiser fix Ms. Caplin's transcripts; require Keiser pay for Ms. Caplin's damages resulting from Keiser's discrimination, including but not limited to tuition and lost wages; reasonable costs and attorney's fees; and award any and all other relief this Court may deem necessary and appropriate.

<u>**COUNT II**</u>
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT,**
**42 U.S.C. § 12131, *et seq.***

130.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 115 as if incorporated fully herein.

131.     Plaintiff is a "qualified individual with a disability" pursuant to the ADA, 42 U.S.C. § 12131(2). She was at all times relevant hereto entitled to be free from discrimination in educational services she received.

132.     Defendant has and is currently providing education services to the general public and receiving federal financial assistance and is, therefore, a "public entity" within the meaning of the ADA. 42 U.S.C. § 12131, *et seq.*

133.     Defendant violated Title II of the ADA in its gross mismanagement of its education program as it pertains to students with disabilities, which subjected Ms. Caplin to discrimination on the basis of her disability, by committing the acts described above.

134.     Keiser violated Title II of the ADA by denying equal services, programs or activities to Ms. Caplin, based on her disabilities.

135.     Defendant violated Title II of the ADA further by, without limitation, failing to provide Ms. Caplin with required accommodations in the clinic course, removing her from the clinic course on multiple occasions, benching her from participation, failing to provide clients to examine, failing to provide feedback to her after seeing patients, and failing to provide appropriate accommodations to her.

136.     Since Ms. Caplin's enrollment, Keiser, by and through its employees, all acting under color of law, have engaged in a pattern of discrimination, harassment, intimidation, and retaliation against the Plaintiff.

137.     Such discrimination, harassment, intimidation, and retaliation referred to above would not have occurred but for the Plaintiff's complaints and requests to be provided with her required accommodations, complaints about Keiser's program, her filing of internal complaints with Keiser, and OCR Complaint filed.

138.     Ms. Caplin has no adequate or speedy remedy at law for Keiser's conduct described above. Because Keiser's discriminatory conduct is ongoing, declaratory and injunctive relief against Keiser is appropriate pursuant to 42 U.S.C. § 12133.

139.     Plaintiff is also entitled to recover reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 12205.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against the Defendant, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies, and procedures have subjected Plaintiff to discrimination in violation of the Americans with Disabilities Act permanently enjoining the Defendant from any practice, policy and/or procedure which will deny Ms. Caplin equal access to, and benefit from the Defendant's services, award compensatory damages; reinstate Ms. Caplin into the educational program and allow Ms. Caplin to complete her clinical courses at an outside facility; require Keiser fix Ms. Caplin's transcripts; require Keiser pay for Ms. Caplin's damages resulting from Keiser's discrimination, including but not limited to tuition and lost wages; reasonable cost and attorneys' fees; and award any and all other relief that may be necessary and appropriate.

**COUNT III**
**SECTION 12203 RETALIATION CLAIM**

140.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 115 as if incorporated fully herein.

141.    Plaintiff brings this retaliation claim against Keiser, pursuant to the ADA's prohibition against retaliation as set forth in 42 U.S.C. § 12203.

142.    The ADA prohibits retaliation against an individual for asserting rights under Title II. 42 U.S.C. § 12203. Retaliation is prohibited against any individual who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the ADA. 42 U.S.C. § 12203(a); *see also* 28 C.F.R. 36.206(c)(4) (prohibiting "[r]etaliating against any person because that person has participated in any investigation or action to enforce the [ADA]" in public accommodations). Title V allows victims of retaliation to seek the same type of relief provided in the underlying ADA title. See 41 U.S.C. § 12203(c) (incorporating the remedies

and procedures of Titles I, II, and III for retaliation claims brought under Title V); *Shotz v. City of Plantation*, 344 F.3d 1161, 1181 n.31 (11th Cir. 2003) (stating that the anti-retaliation provision "provides the same remedies and procedures for victims . . . as in the underlying title").

143.   Section 504 of the Rehabilitation Act of 1973 prohibits disability discrimination in programs or activities that receive federal financial assistance.

144.   The plain unambiguous language of the statutory and regulatory frameworks prohibits discriminating against an individual because that individual engaged in its statutorily and Constitutionally protected conduct pursuant to this chapter of the ADA, 42 U.S.C. § 12131, et seq., Title II of the ADA.

145.   As a remedial civil rights statute, the ADA is to be broadly construed to effectuate its purpose.

146.   Ms. Caplin is an individual with handicaps as defined by the Rehabilitation Act, 20 U.S.C. § 794, *et seq*.

147.   Ms. Caplin was at all times relevant hereto "otherwise qualified" to participate in Keiser's educational program.

148.   Keiser has and currently is providing educational services to the general public and receiving federal financial assistance and is, therefore, a covered entity within the meaning of the Rehabilitation Act. Keiser is a recipient of federal assistance within the meaning of 29 U.S.C. §794(a). Keiser's chiropractic program is a "program or activity" within the meaning of 29 U.S.C. § 794(b).

149.   Ms. Caplin made repeated requests by emailing and meeting with Keiser's staff, president, deans, and several of its agents.

150.     Keiser has continuously retaliated against Ms. Caplin since the day she attempted to enforce her rightful accommodations, as more fully described above, to the point where Keiser failed Ms. Caplin from her clinical course a second time and dismissed her from the university and program altogether without ever providing the required accommodations requested on multiple occasions.

151.     Keiser especially retaliated against Ms. Caplin after she filed a discrimination complaint with Keiser directly and an OCR complaint. Ms. Caplin was dismissed from Keiser the same semester she filed the OCR complaint against Keiser.

152.     Keiser never intended in providing Ms. Caplin with her required accommodation, instead it took all of Ms. Caplin's tuition payments and ignored her repeated requests to provide accommodations, and to provide her an equal opportunity in her training to become a chiropractor.

153.     Ms. Caplin has been damaged as a result of Keiser's retaliation. Ms. Caplin has been dismissed from the chiropractic program and left without a chiropractic degree, without the ability to enroll in any other school because she must be a student in good standing. Ms. Caplin has been left without any other resources to complete her career.

154.     Had Keiser provided Ms. Caplin with her accommodations and not retaliated against Ms. Caplin, Ms. Caplin would have completed her career by now.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against the Defendant, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies, and procedures have been a product of retaliation against the Plaintiff after asserting her rights under Title II of the ADA, award compensatory damages; reinstate Ms. Caplin into the educational program and allow Ms. Caplin to complete her clinical courses at an outside facility; require Keiser fix Ms.

Caplin's transcripts; require Keiser pay for Ms. Caplin's damages resulting from Keiser's discrimination, including but not limited to tuition and lost wages; reasonable cost and attorneys' fees; and award any and all other relief that may be necessary and appropriate.

**COUNT IV**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS - § 1983**

155.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 115 as if incorporated fully herein.

156.     Defendant, including its agents and employees, acting in their official capacities under color of law, through their non-compliance with Section 504, and the ADA, have individually, jointly, and severally deprived Ms. Caplin of her federally protected rights, including her right to a free, appropriate education and to due process of law, and created a hostile educational environment, rendering Defendant liable under 42 U.S.C. § 1983.

157.     Since Ms. Caplin's enrollment, Keiser, by and through its employees, all acting under color of law, have engaged in a pattern of discrimination, harassment, intimidation, and retaliation against the Plaintiff.

158.     Such discrimination, harassment, intimidation, and retaliation referred to above would not have occurred but for the Plaintiff's complaints and requests to be provided with her required accommodations, complaints about Keiser's program, her filing of internal complaints with Keiser, and OCR Complaint filed.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against the Defendant, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant, through its non-compliance with Section 504, and the ADA, has individually, jointly, and severally deprived Ms. Caplin of her federally protected right, award compensatory damages; reinstate Ms. Caplin into the educational

program and allow Ms. Caplin to complete her clinical courses at an outside facility; require Keiser

fix Ms. Caplin's transcripts; require Keiser pay for Ms. Caplin's damages resulting from Keiser's

discrimination, including but not limited to tuition and lost wages; reasonable cost and attorneys'

fees; and award any and all other relief that may be necessary and appropriate.

## **JURY DEMAND**

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISUES FOR WHICH A TRIAL BY JURY IS PERMITTED.**

Dated: May 5, 2020                            Respectfully submitted,

**AINSWORTH + CLANCY, PLLC**
801 Brickell Avenue, 9th Floor
Miami, FL 33131
Telephone: (305) 600-3816
Facsimile: (305) 600-3817
*Counsel for Plaintiff*

By: s/ Ryan Clancy
Ryan M. Clancy, Esq.
Florida Bar No. 117650
Email: ryan@business-esq.com
Email: info@business-esq.com